## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**TONY DOOLIN**                                                              **PLAINTIFF**
**#0034357**

**V.**                          **NO. 2:20-cv-00111-LPR-ERE**

**UNITED STATES OF AMERICA**                                    **DEFENDANT**

### RECOMMENDED DISPOSITION

### I.   Procedures for Filing Objections

This Recommendation for dismissal has been sent to Judge Lee P. Rudofsky. Any party may file objections if they disagree with the findings or conclusions set out in the Recommendation. Objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be filed within 14 days. If parties do not file objections, they risk waiving the right to appeal questions of fact. And, if no objections are filed, Judge Rudofsky can adopt this Recommendation without independently reviewing the record.

### II.   Background

Plaintiff Tony Doolin filed this *pro se* Federal Tort Claims Act ("FTCA") action asserting a claim for negligent medical care while incarcerated in the Federal

Correctional Complex ("FCC") in Forrest City, Arkansas.[1] *Doc. 1*. Mr. Doolin's claims arise from an incident on October 26, 2018, in which he fell from a top bunk and suffered a bruised rib, serious back strain, a contusion of the lower eye lid, and a broken tooth. *Doc. 1*. Mr. Doolin contends that he was denied reasonable medical care for these injuries. *Doc. 1 at p.3*. Specifically, he argues that he should have been given: (1) a lower bunk pass before October 26th, which would have prevented the incident; (2) an MRI on his neck and back to address his persistent pain; and (3) a cap or crown for his broken tooth. *Doc. 1, p. 2-4*.

Defendant United States of America filed a motion for summary judgment on all claims, along with a brief in support and statement of undisputed facts. *Docs. 35-37*. Mr. Doolin responded. *Docs. 40-41*. For reasons that follow, the Court recommends Defendant's motion for summary judgment (*Doc. 35*) be GRANTED, and this case be dismissed with prejudice.

## III.  <u>Standard</u>

Summary judgment means that the court rules in favor of a party without the need for a trial. Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute

---

[1] On February 16, 2021, Mr. Doolin was released from the FCC.  *Doc. 37-1 at p. 2.*  He is currently being held at the Greene County Detention Center. *Doc. 31* (change of address form).

as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986).   The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.   *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial.   *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

## IV.   **Facts**[2]

The Court discusses separately the alleged denial of a lower bunk pass and Mr. Doolin's back injury, which are related, and his tooth injury.

### A.   **Denial of a Lower Bunk Pass and Treatment for Back Injury**

Mr. Doolin arrived at the FCC on June 22, 2017 and during his June 29, 2017 intake review, he reported a history of lower back pain and shoulder pain resulting from a fall that took place five years earlier. *Docs. 37-1 at ¶ 5; 42, Ex. B.* A physician

---

[2] The sources for the undisputed facts include: (1) Mr. Doolin's sworn complaint, response, and statement of facts (*Docs. 1, 18 & 41)*; (2) the Declaration of Dr. Maharaj Tomar, with supporting medical records, exhibits A through X (*Docs. 37-1 & 42*); and (3) the Declaration of Walker Stewart Jr., D.D.S., with supporting dental records, A through X (*Docs. 37-2 & 43*).
   The Court recently entered an Order unsealing the two Declarations and attached medical and dental records.   *See Doc. 47.*

performed an examination and prescribed Ibuprofen for lower back and shoulder pain. *Id*.

On July 12, 2017, x-rays were taken of Mr. Doolin's lower back. *Docs. 37-1 at ¶ 6; 42, Ex. C.* The results were "unremarkable," showing normal height and alignment of vertebra, normal bone mineralization, normal lumbar lordosis, and proper disc spacing. *Id.*

In April 2018, Mr. Doolin placed a sick-call request for a lower bunk pass because he had fallen off his bed twice and had lower back pain. *Docs. 37-1 at ¶ 7; 42, Ex. D.* He was given a 14-day lower bunk pass until he could be evaluated. *Id.* The lower bunk pass was active from April 27, 2018, to May 11, 2018. *Doc. 37-1 at ¶ 7.*

On May 8, 2018, while the temporary lower bunk pass was in effect, Mr. Doolin failed to show up for the appointment scheduled in response to his sick-call request. *Docs. 37-1 at ¶ 7; 42, Ex. D.*

On May 22, 2018, a provider examined and evaluated Mr. Doolin for the previously noted sick-call request. *Docs. 37-1 at ¶ 8; 42, Ex. E.* During the visit, Mr. Doolin reported back pain and neuropathy from a motor vehicle accident five years prior and stated that he was told he had nerve and tissue damage. *Id.* He did not mention a request for a lower bunk pass, and the temporary lower bunk pass was not

renewed. *Id*. The provider prescribed Amitriptyline 25 mg for 30 days and Duloxetine 30 mg for 90 days. *Id.*

On October 26, 2018, 168 days after Mr. Doolin's lower bunk pass expired, Mr. Doolin reported to health services that he fell from his bunk earlier that morning. *Docs. 37-1 at ¶ 9; 42, Ex. F*. A physician assistant evaluated and examined Mr. Doolin. *Id*. The physician assistant noted that Mr. Doolin presented with ecchymosis (bruising) and swelling to his left eye but reported no blurry vision. *Id*. Mr. Doolin reported that he hit his eye on his knee during the fall. *Id*. The physician assistant noted that he had a normal gait, could sit and stand without difficulty, and did not limp. *Id*. He had a chipped tooth, so the physician assistant scheduled a dental evaluation. *Id*. Mr. Doolin stated he had a history of lower back spasms and claimed he was supposed to have a lower bunk pass. *Id*. The physician assistant noted that Mr. Doolin was given a temporary pass in May 2018 that had expired and noted that Mr. Doolin was sitting forward with his hands on his knees with no obvious pain or facial grimace. *Id*. The physician assistant reviewed Mr. Doolin's previous lumbar spine x-rays from July 2017 and noted they were unremarkable. *Id*. Mr. Doolin was prescribed Acetaminophen 325 mg twice a day for two days. *Id*. The physician

5

assistant did not issue a lower bunk pass due to the negative exam and not meeting the criteria for a lower bunk.[3] *Id.*

On November 13, 2018, at a chronic care visit, a clinician examined and evaluated Mr. Doolin for upper and lower back pain that he reported was related to the fall from his bunk. *Docs. 37-1 at ¶ 10; 42, Ex. G*. The clinician issued: (1) new medication orders for Duloxetine HCI; (2) additional x-rays; and (3) a temporary lower bunk pass with a May 28, 2019 expiration date. *Docs. 37-1 at ¶ 10; 42, Ex. H*.

On December 4, 2018, a three-view lumbar radiograph was taken of Mr. Doolin's spine. *Docs. 37-1 at ¶ 11; 42, Ex. I*. The radiologist compared the radiograph to the June 12, 2017 radiograph and noted minimal L5-Sl "facet arthropathy," but no radiographic evidence of any fracture or malalignment.[4] *Id.* According to Dr. Tomar's declaration, "[f]acet arthropathy is a 'degenerative syndrome that typically occurs secondary to age, obesity, poor body mechanics, repetitive overuse and microtrauma.'" *Doc. 37-1 at ¶ 25* (quoting Steven J. Mann, *et al.*, *StatPearls: Lumbar Facet Arthropathy*).

---

[3] Lower back pain is not a qualifying condition that allows an inmate to receive a lower bunk pass at the Federal Bureau of Prisons (BOP). *Docs. 37-1 at ¶ 28; 42, Ex. X*.

[4] Minimal facet arthropathy is not a qualifying condition that allows an inmate to receive a lower bunk pass at the BOP. *Docs. 37-1 at ¶ 28; 42, Ex. X*.

On June 23, 2019, staff found Mr. Doolin lying on the floor in his cell vomiting. *Docs. 37-1 at ¶ 12; 42, Ex. J*. Mr. Doolin admitted to being drunk. *Id*. As a result, Mr. Doolin was placed in disciplinary segregation and ultimately moved from the FCC Forrest City Low Institution to FCC Forrest City, Medium Institution on November 14, 2019. *Docs. 37-1 at ¶ 12; 42, Ex. K*.

On August 22, 2019, a clinician evaluated and examined Mr. Doolin for his complaints of neck and back pain, a loss of feeling in his legs (which he reported experiencing over the last five years). *Docs. 37-1 at ¶ 13; 42, Ex. L*. According to Mr. Doolin, his symptoms had become worse the last two years, and sometimes he was unable to move his legs. *Id*. He claimed that his symptoms had worsened in the previous three months. *Id*. The clinician examined Mr. Doolin and found tenderness and a decreased range of motion. *Id*. The treating clinician changed Mr. Doolin's pain medication, increasing his Duloxetine dosage to 60 mg each evening for 90 days and ordering Naproxen 500 mg twice daily for 90 days. *Id*. The clinician requested an MRI of his spine. *Id.*

On September 26, 2019, a clinician examined and evaluated Mr. Doolin after he placed a sick-call request complaining of ringing in his ears and a lump on his stomach and requesting an MRI of his neck and back. *Docs. 37-1 at ¶ 14; 42, Ex. M*. The clinician told Mr. Doolin that an MRI had been scheduled. *Id*. The clinician

noted Mr. Doolin was sitting to standing without difficulty and found that he had a normal range of motion and was able to ambulate without difficulty. *Id*. The clinician referred Mr. Doolin to a medical doctor for pain management. *Id*.

On November 27, 2019, a physician examined Mr. Doolin for his annual chronic care visit. *Docs. 37-1 at ¶ 15; 42, Ex. N*. The physician reviewed his history of back pain and treatment, including x-ray imaging and medications. *Id*. Mr. Doolin reported he had participated in physical therapy for lower back pain in 2016, prior to his incarceration, without any improvement. *Id*. On examination, the treating physician noted the following:

> During straight leg testing, [patient] felt pain radiate from lumbar spine top feet and denied radiation to buttocks/hamstrings. However, this study has low specificity. Leg exam revealed [normal] strength, no atrophy and [normal] patellar/Achilles reflexes. Although paresthesias [burning or prickling sensation often referred to as "pins and needles"] worsened after fall, they have not been progressive, which argues against infection and neoplasm. A compression fracture was ruled out with XR [x-ray] just after fall. Without leg weakness and abnormal reflexes and with only mild anterolisthesis on XR, the likelihood of discovering actionable pathology that would lead to interventional pain mgmt is unlikely. [Patient] appeared very motivated to be imaged[,] and I can't verify that he indeed completed [physical therapy] exercises weekly for the past three years. Due to stable course of [lower back pain] and a lack of red flag signs, 3 months of [physical therapy) for [lower back pain] is reasonable followed by reassessment.

*Id*. Based on this assessment, the physician discontinued the pending MRI consult. *Id*. Mr. Doolin's Naproxen 500mg prescription was renewed, and physical therapy was ordered. *Id.*

On January 21, 2020, a physician examined Mr. Doolin for a follow-up visit. *Docs. 37-1 at ¶ 16; 42, Ex. O.* The physician denied Mr. Doolin's request for a steroid injection, explaining to Mr. Doolin that a "steroid injection would not reduce pain and would instead in time result in joint destruction." *Id*. The physician also explained that the December 2018 x-ray "identified L5/S1 facet arthropathy" but Mr. Doolin's back pain was "mid-thoracic rather than lumbar." *Id*. The physician found that Mr. Doolin had "no focal neurological deficits to justify MRI" and that his back pain was primarily "attributable to a combination of poor posture, prolonged sitting, and lack of exercise." *Id*. Mr. Doolin said he had performed physical therapy exercises ordered in November 2019, but he could not remember what most of them were. *Id*. The physician provided Mr. Doolin with a more targeted exercise regimen and asked him to perform the exercises two or three times per day, to avoid prolonged sitting and poor posture. *Id*. The physician concluded that neither an MRI nor an orthopedic surgery consultation was clinically indicated. *Id*. Mr. Doolin was prescribed Oxcarbamazepine for pain management. *Id*.

On January 22, 2020, a BOP physician ordered an x-ray of the thoracic spine, where Mr. Doolin reported most of his pain. The physician ordered the x-ray to rule out "osseous abnormality or spondylolisthesis at the thoracic level." *Docs. 37-1 at ¶ 17; 42, Ex. P.* On March 11, 2020, the x-ray was completed, and the radiologist noted "there is no scoliosis," "normal thoracic kyphosis," "disc spaces are preserved," and "bone mineralization is normal." *Id*. The radiologist concluding impression was: "unremarkable thoracic spine radiographs." *Id*.

On January 27, 2020, a physician examined Mr. Doolin for a follow-up visit. *Docs. 37-1 at ¶ 18; 42, Ex. Q.* The physician ordered a thoracic spine x-ray but explained that an MRI would only be ordered if the x-ray showed it was necessary. *Id*. He also increased Mr. Doolin's Trileptal prescription and renewed his Naproxen prescription. *Id.*

On March 9, 2020, a physician examined Mr. Doolin for another follow-up visit. *Docs. 37-1 at ¶ 19; 42, Ex. R.* The physician found that Mr. Doolin's then current regimen of Trileptal, Naproxen, and physical therapy was "mildly effective." *Id*. The physician explained that Mr. Doolin did not have clinical indication for additional imaging and that neither Gabapentin nor steroid injections were clinically indicated. *Id*. The physician noted that during the visit, Mr. Doolin had very poor posture and found it likely that he "has not given PT a good-faith effort." *Id*. The

physician told Mr. Doolin that he had "obsessive thought patterns that complicate his experience of pain" but that they would hopefully be ameliorated with Wellbutrin, his anxiety medication. *Id.*

In March 2020, psychology services performed a diagnostic reconciliation interview to review and update Mr. Doolin's various mental health diagnoses. Mr. Doolin was diagnosed with generalized anxiety disorder and unspecified somatic symptom disorder. *Docs. 37-1 at ¶ 20; 42, Ex. S.* In an administrative note, Mr. Doolin's physician noted that Mr. Doolin "genuinely experiences anxiety due to current medical diagnosis, but level of concern is excessive." *Id.* Mr. Doolin was enrolled in cognitive behavioral therapy to help manage "reactions to environmental stimuli." *Id.*

On May 2, 2020, Mr. Doolin saw a BOP physician and requested a refill of Trileptal. *Docs. 37-1 at ¶ 21; 42, Ex. T.* On May 4, 2020, the physician denied the request because the medication had proved ineffective. *Id.* On May 22, 2020, the physician noted that Mr. Doolin did not meet the BOP prescribing policy for treatment with a "TENS unit." *Id.*

On July 1, 2020, a clinician examined Mr. Doolin at a follow up visit. *Docs. 37-1 at ¶ 22; 42, Ex. U.* Mr. Doolin reported that a physician had mistakenly discontinued Trileptal but should have discontinued Naproxen. *Id.* The clinician

11

wrote a new prescription for Trileptal and discontinued Naproxen. *Id*. Upon review, the prescribing physician noted that there was no mistake, and he reversed the new medication orders.[5]  *Docs. 37-1 at ¶ 22.*

On August 12, 2020, a clinician examined Mr. Doolin after he filed a sick-call request complaining of sudden back pain in the lower right side and that he felt a pop while sitting. *Docs. 37-1 at ¶ 23; 42, Ex.* V. Upon examination, the clinician noted that Mr. Doolin had elevated blood pressure and appeared to have a muscle spasm on the right mid-to-low side of his back. *Id*. The physician treated Mr. Doolin with a Toradol injection, heat, and a muscle rub ointment. *Id*.

On August 19, 2020, a physician ordered a steroid pack for further treatment of Mr. Doolin's lower back pain. *Docs. 37-1 at ¶ 23; 42, Ex.* W.

### B.    Treatment for Broken Tooth

On October 26, 2018, a dentist examined Mr. Doolin after he reported a broken tooth. *Docs. 37-2 at ¶ 7; 43, Ex. D.* According to the examination notes, Mr. Doolin had been in a fight, and there was a fracture halfway down tooth #9, the upper incisor tooth. *Id*. The dentist bonded the fragment back to the tooth. *Id*. Mr. Doolin

---

[5] In Dr. Tomar's declaration, he cites to a cosign note. *Doc. 42, Ex. U*. However, the note was not included in the exhibits provided to the Court.

was advised to be very guarded with the tooth and that he would need a crown upon release from prison. *Id.*

On March 14, 2019, a dentist examined Mr. Doolin because the fracture was coming loose. *Docs. 37-2 at ¶ 8; 4-13, Ex. E.* Mr. Doolin did not report any pain. *Id.* The dentist re-cemented the fractured half of #9 tooth and advised Mr. Doolin that it would be the last time to try this treatment. *Id.* The dentist advised Mr. Doolin that he would need a crown upon release. *Id.*

On May 2 and May 7, 2019, Mr. Doolin failed to appear for a scheduled routine dental hygiene appointment. *Docs. 37-2 at ¶ 9-10; 43, Ex. F & G.* As a result of these missed appointments, dental services removed Mr. Doolin from the routine treatment list. *Doc. 37-2 at ¶ 10; 43, Ex. G.*

On September 5, 2019, a dentist examined Mr. Doolin after he reported that he had broken a tooth, with an exposed nerve. *Docs. 37-2 at ¶ 11; 43, Ex. H.* Mr. Doolin demanded a crown and threatened staff with a lawsuit if he did not get a crown. *Id.* The dentist informed Mr. Doolin that a crown was considered advanced elective care that would have to be done after his release. *Id.* The dentist reminded Mr. Doolin that when the fracture was bonded to the tooth, he was told the procedure would not be repeated. *Id.* Mr. Doolin first refused the bonding and then stated he wanted it. *Id.* The dentist placed bonding over dentin and noted no sensitivity. *Id.*

13

The dentist reiterated to Mr. Doolin that his tooth would need a crown upon release. *Id*.

On September 23, 2019, Mr. Doolin filed an inmate request complaining of pain and sensitivity in the tooth and asked for a crown. *Docs. 37-2 at ¶ 12; 43, Ex. I*. The dentist responded that continued pain following the composite restoration could mean the tooth is non-restorable. *Id*. The dentist directed Mr. Doolin to place a sick-call request if he wished to have the tooth extracted. *Id*. According to the testimony of Dr. Walter Stewart, the chief dental officer for the BOP who reviewed Mr. Doolin's medical and dental records, Mr. Doolin never placed a sick-call request regarding this matter. *Doc. 37-2 at ¶ 12*.

In September 2019, Mr. Doolin filed a request complaining about his dental care and requesting a crown. *Docs. 37-2 at ¶ 13; 43, Ex. J*. The warden denied his request on October 10, 2019, noting that a crown was considered advanced elective care and that he should have the procedure done upon release. *Id*. The warden also noted that bonding over the exposed dentin could be performed to reduce sensitivity. *Id*. Mr. Doolin appealed, and the response informed Mr. Doolin that "[t]he placement of a crown is not an emergent situation and is an elective procedure subject to approval after routine dental care is completed." *Id*. The response further instructed

14

Mr. Doolin on how to get back on the routine treatment list and how to receive emergent dental care. *Id.*

On November 14, 2019, Mr. Doolin was transferred to FCC Forrest City, Medium Institution. *Docs. 37-2 at ¶ 17; 43, Ex. K.*

On December 18, 2019, a dentist examined Mr. Doolin after he complained that his broken tooth was sensitive to cold and that he needed a crown. *Docs. 37-2 at ¶ 15; 43, Ex. L.* An examination revealed that the composite restoration placed over the exposed dentin was still intact. *Id.* Mr. Doolin was informed there was no exposed dentin and that a crown would need to be placed after he was released from the BOP. *Id.*

On January 22, 2020, Mr. Doolin was placed back on the dental routine treatment list and was informed that the then-current wait time for routine comprehensive dental exams was approximately 12–18 months. *Docs. 37-2 at ¶ 16; 43, Ex. M.* Mr. Doolin sent multiple electronic messages to health services, complaining about the length of the wait time for routine dental treatment and urging immediate placement of a crown. *Id.* Mr. Doolin was reminded that the dentist had found no cavities on the tooth, the filling was still intact, there was no exposed dentin, the tooth had good function, and the tooth did not currently need emergency care. *Id.*

On March 13, 2020, the BOP went on a nationwide lockdown and instituted modified operations to restrain the spread of COVID-19. *Doc. 37-2 at ¶ 17.* As part of this effort, all non-emergent dental procedures were suspended. *Id.*

On April 2, 2020, a dentist examined Mr. Doolin in his cell after he complained that the bonding was coming off his tooth. *Docs. 37-2 at ¶ 18; 43, Ex. N.* The dentist concluded that "[t]he objective findings do not appear to equate with the subjective complaints." *Id.* The dentist noted the problem was "esthetic and not emergent in nature." *Id.* Due to the suspension of all non-emergent dental care, no further treatment was completed. *Id.* The dentist instructed Mr. Doolin to continue take over-the-counter pain medication, to place fluoride toothpaste over the dentinal surface for several minutes after brushing before rinsing, and to avoid direct temperatures on the tooth. *Id.*

On April 22, 2020, Mr. Doolin submitted an electronic request complaining about his dental care and demanding a crown. *Docs. 37-2 at ¶ 19; 43, Ex. O.* Health services responded, noting that the dentist has examined the tooth and found it to be non-emergent. *Id.* The response reiterated the treatment recommendation of placing fluoride toothpaste over the tooth for several minutes after brushing and reminded Mr. Doolin that "[p]er BOP guideline, due to the COVID 19 pandemic, no dental elective will be done at this time." *Id.*

16

Mr. Doolin continued to request a crown and complain of pain and sensitivity throughout the summer on May 15, July 23, and August 7, 2020. *Docs. 37-2 at ¶ 19; 43, Ex. P.*

On September 18, 2020, Mr. Doolin had a consultation after he complained that he had a severe tooth ache. *Docs. 37-2 at ¶ 20; 43, Ex. Q.* The provider noted that Mr. Doolin was positive for COVID-19 and prescribed him Tylenol #3 (Acetaminophen/Codeine 300/30mg) two times a day for three days. *Id.*

On September 21, 2020, while Mr. Doolin was in quarantine with COVID-19, the dentist visited him at his cell and examined the tooth. *Docs. 37-2 at ¶ 21; 43, Ex. R.* The dentist found tenderness around tooth #9, writing, "[i]t appears that the tooth #9 may have become necrotic from the past trauma that was experienced." *Id.* "Necrotic" refers to the death of the nerve. *Doc. 37-2 at ¶ 21.* In addition, there was swelling around the upper lips and gums. *Docs. 37-2 at ¶ 21; 43, Ex. R.* The dentist prescribed a course of antibiotic treatment to treat the infection and some pain medication to be taken between doses of Tylenol #3 to treat Mr. Doolin's reports of pain. *Id.*

On September 22, 2020, an officer called health services to report that Mr. Doolin told him that he was in the worst pain of his life and that he needed his Tylenol #3 renewed. *Docs. 37-2 at ¶ 22; 43, Ex. S.* The health services note states,

17

that the "tooth was addressed by dental[,] and [Mr. Doolin] is on antibiotics and Tylenol for pain." *Id*.

On December 2, 2020, a follow-up dental encounter was cancelled due to a COVID-19 lockdown in Mr. Doolin's housing unit. *Docs. 37-2 at ¶ 23; 43, Ex. T.*

On February 4, 2021, Mr. Doolin sent an electronic message to dental services explaining that the abscess in his mouth was inflamed and he had swelling and pain. *Docs. 37-2 at ¶ 24; 43, Ex. U.* Mr. Doolin requested a renewed antibiotic prescription and pain medication such as Ibuprofen 800mg. *Id*. The following day, a dentist examined Mr. Doolin in his cell where he was quarantined. *Docs. 37-2 at ¶ 25; 43, Ex. V.* Mr. Doolin reported that "the bump on his gum drained and went down, but that he feels like the root area is becoming more sensitive." *Id*. Upon examination, the dentist noted swelling around tooth #9 and #10 but found no facial swelling. *Id*. The dentist identified signs of "a draining tract on the labial gingiva at tooth #9-10 area" but noted that it "does not appear active or erythematous at this time." *Id*. The dentist also noted, "[s]uspect tooth #10 may also have been affected by the trauma and may end up necrotic." *Id*. The dentist placed Mr. Doolin on another course of antibiotics and NSAID pain medication. *Id*.

On February 16, 2021, Mr. Doolin was released from the Bureau of Prisons via good conduct time release. *Docs. 37-2 at ¶ 26; 43, Ex. K.*

18

## V.    **Discussion**

Under the FTCA, the United States may be held vicariously liable for negligent or otherwise wrongful acts committed by federal employees acting within the scope of their employment. *See* 28 U.S.C. §§ 1346, 2671-2680; *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998). The Westfall Act, codified at 28 U.S.C. § 2679((b), "convert[s] state torts claims against individual officers into FTCA claims against the United States." *Meshal v. Higgenbotham,* 804 F.3d 417, 428 (D.C. Cir. 2015). The exclusive legal remedy available to a party who has been injured as a result of a tort committed by a federal employee is a claim against the United States itself, brought under the FTCA. *Id.* ("the injured person must sue the United States which is liable in its employee's stead"); *see* 28 U.S.C. § 1346(b)(1), § 2679.

Claims brought under the FTCA are governed by the substantive law of the state where the allegedly tortious acts occurred, in this case, Arkansas. See 28 U.S.C. § 1346(b); *White v. United States*, No. 19-1878 (8th Cir. 2020); *Johnson v. United States*, 534 F.3d 958, 963 (8th Cir. 2008); *Molzof v. United States,* 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.").

Under Arkansas law, a plaintiff claiming medical negligence must prove: (1)

19

the applicable standard of care; (2) a breach of that standard; and (3) proximate causation. ARK. CODE ANN. § 16-114-206(a); *Worden v. Kirchner*, 2013 Ark. 509, *6 (2013); *Robson v. Tinnin*, 911 S.W.2d 246 (Ark. 1995) (applying § 16-114-206(a) to a dental malpractice case). A plaintiff bears the burden of proving these essential elements by expert testimony, except in limited circumstances, discussed below. ARK. CODE ANN. § 16-114-206(a).[6] Generally, summary judgment is appropriate when a plaintiff fails to provide expert testimony to support his medical negligence claim under Arkansas law. See *Day v. United States*, 865 F.3d 1082, 1086 (8th Cir. 2017) (holding, in an FTCA claim applying Arkansas law, that in order to avoid summary judgment, expert medical testimony must establish that the injuries would not have occurred absent defendant's negligence).

A narrow "common knowledge" exception to the expert requirement exists, but it only applies where the standard of care, breach, and proximate cause are "within the jury's comprehension as a matter of common knowledge." Ark. Code Ann. § 16-114-206(a); *Haas v. Starnes*, 915 S.W.2d 675, 678 (Ark. 1996) (explaining that the common knowledge exception applies to obvious cases of

---

[6] This statute was partially invalidated by *Broussard v. St. Edward Mercy Health System, Inc.*, 2012 Ark. 14, at 7-8 (holding the statute's requirement for expert medical testimony by medical provider in same specialty as defendant an unconstitutional violation of separation of powers).

negligence such as "a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it"); *Mitchell v. Lincoln,* 237 S.W.3d 455, 460 (Ark. 2006) (explaining in the "vast majority" of cases, Arkansas courts have held that the common knowledge exception does not apply ).

Defendant argues that Mr. Doolin's medical negligence claims fail as a matter of law because he offers no expert testimony to establish the applicable "standard of care" owed to him, how the standard was breached, or proximate causation. Defendant argues that Mr. Doolin's claims involve a medical or dental standard of care that is not within the common knowledge of lay persons, specifically whether the BOP medical providers should have: (1) issued Mr. Doolin a lower bunk pass; (2) ordered an MRI on his neck and back; and (3) capped or crowned his broken tooth. The Court agrees that Mr. Doolin needs expert testimony to prevail on all three issues, which are are beyond the common knowledge of the jury.

The Court acknowledges that whether a "standard of care" exists with respect to issuing a lower bunk pass is debatable. As Dr. Maharaj Tomar, the BOP's Clinical Director, acknowledges in his declaration, he is "aware of no analogous local standard of care for the prescribing of lower bunks," an issue that is unique to the prison context. *Doc. 37-1 at ¶ 27*. The BOP, to deal with the limited availability of lower bunks, "has assigned to local Health Services Units the responsibility of

21

assigning inmates to lower bunks based upon their medical needs." *Id. at ¶ 28*; *Doc. 42, Ex. X.* Thus, the issue of whether a BOP inmate qualifies for a lower bunk is a medical issue, and, as discussed in greater detail below, Dr. Tomar opines that Mr. Doolin's health condition did not meet the BOP's lower bunk criteria. *Doc. 37-1 at ¶ 27.* At a minimum, Mr. Doolin has the burden of presenting medical evidence to contradict Dr. Tomar's testimony on this issue. But, Mr. Doolin offers nothing other than his own lay opinion that he should have been given a lower bunk pass, which is insufficient to create an issue of fact for trial.

From his review of Mr. Doolin's medical records, Dr. Tomay opines that, because of Mr. Doolin's long history of back pain, "it is difficult if not impossible to identify with any degree of medical certainty [that] the October 26, 2018 fall caused the facet arthropathy." *Doc. 37-1 at ¶ 29.* Dr. Tomar also opines that the treatment Mr. Doolin received for reports of lower back pain, neuropathy, and facet arthropathy was within the standard of care in the surrounding locality for treatment. *Doc. 37-1 at ¶ 26-27, 30.* Noting that neither minimal facet arthropathy nor general lower back pain meet medical criteria for a bottom bunk, Dr. Tomar explains that while "peripheral neuropathy stage III" is a qualifying condition, at no point did Mr. Doolin reach stage III neuropathy during his incarceration at FCC in Forrest City.

*Docs. 37-1 at ¶ 28; 42, Ex. X.* Accordingly, Dr. Tomar concludes that Mr. Doolin never met the BOP's criteria for receiving a lower bunk pass. *Doc. 37-1 at ¶ 26-27.*

The USA also produced the declaration of Dr. Walter Stewart Jr, the Chief Dental Officer for the FCC in Forrest City. *Doc. 37-2.* He testified that he was familiar with Mr. Doolin's dental records. *Doc. 37-2 at ¶ 2.* Dr. Stewart explained that the BOP generally does not provide cosmetic or elective restorative dentistry to inmates. Instead, the BOP's mission is "to stabilize and maintain" the oral health of inmates. *Doc. 37-2 at ¶ 27.* As Dr. Stewart testified:

> Based upon a review of the inmate's treatment history and medical records, it is my opinion as a licensed dentist, with a reasonable degree of medical certainty, that FCC Forrest City Central Clinic provided reasonable, essential dental care to Doolin. Whenever Doolin complained, the Dental Clinic responded promptly. The fractured tooth was frequently treated to prevent degradation of the tooth and alleviate symptoms… The temporary bonding of the fragment and the composite bonding placed over the tooth were appropriate conservative dental treatment for the condition presented.
> . . .
> When the tooth became infected in September 2020, the Dental Clinic treated the infection and was able to save the tooth. This was appropriate dental care for the condition and symptoms presented.

*Doc. 37-2 at ¶ 27.*

Not only does Mr. Doolin fail to provide expert testimony to establish that the USA deviated from standard of care, he also fails to present any proof that the care he received at the FCC in Forrest City proximately caused an injury. Arkansas'

medical malpractice statute requires that Mr. Doolin establish *how* any deviation in treatment or misdiagnosis caused him new damage to his back or tooth that he would not have otherwise experienced. ARK. CODE ANN. § 16-114-206(a)(3). The negligence alleged in this case is not a matter within a juror's common knowledge. But even if it were, given the undisputed facts demonstrating that Mr. Doolin received regular care and treatment to address his complaints, the USA is entitled to judgment as a matter of law.

For these reasons, the Court recommends granting Defendant's motion for summary judgment (*Doc. No. 35*) and dismissing all of Mr. Doolin's claims, with prejudice.

## VI.    Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendant United States of America's motion for summary judgment (*Doc. 35*) be GRANTED.

2.    Mr. Doolin's claims against Defendant United States of America be DISMISSED, with prejudice.

Dated this 16th day of July, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

24